**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**SHERMAN DIVISION**

| | |
|---|---|
| **NEW ORLEANS FIREMEN'S FEDERAL CREDIT UNION**, <br><br> Plaintiff, <br><br> v. <br><br> **MARQUIS SOFTWARE SOLUTIONS, INC.**, <br><br> Defendant. | Case No. 4:26-cv-00037 |

**COMPLAINT AND JURY TRIAL DEMAND**

Plaintiff New Orleans Firemen's Federal Credit Union ("NOFFCU" or "Plaintiff"), alleges as follows against Defendant Marquis Software Solutions, Inc. ("Marquis" or "Defendant"):

## I.   SUMMARY OF THE ACTION

1.     Data companies are acutely aware of the critical importance of cybersecurity in an increasingly interconnected world. With the exponential growth of cloud storage, companies are entrusted with highly sensitive and protected confidential information, ranging from personal details to financial records, including those of Plaintiff's members.

2.     Plaintiff NOFFCU is a federally charted, not-for-profit credit union. Marquis, a financial software provider, sold its services to NOFFCU to be a trusted custodian of Plaintiff's members' confidential information[1] ("Confidential Information"). On April 26, 2024, the Parties

---

[1] Under Section 11 of the Master Services Agreement "[a]ll information provided by [NOFFCU] to Marquis under this Agreement (whether related to [NOFFCU] its members or otherwise) will be treated as non-public confidential information ("Confidential Information") by Marquis…."

1

executed a five-year contract (the "Master Services Agreement"), under which Defendant expressly agreed to protect this Confidential Information from public disclosure.

3.    In addition, Defendant's own privacy policy ("Privacy Policy") appearing on its website further represents that Marquis "use[s] commercially reasonable and appropriate safeguards to secure and protect the privacy, accuracy, and reliability of your information and to protect it from unauthorized access, alteration, disclosure, or destruction."[2]

4.    In reality, however, Defendant's security practices were wholly inadequate. Defendant provided Plaintiff with contracted services that were so deficient in security that no regulated financial institution should have been asked to provide its Confidential Information through them. Marquis' systems lacked adequate security controls, resulting in the easy exposure of Confidential Information. Even so, Marquis continued to market and sell its inadequate services to Plaintiff.

5.    These deficiencies were not hypothetical. In August 2025, Defendant suffered a cybersecurity incident ("Cyber Vulnerability Incident" or the "Data Breach") in which unauthorized third parties accessed Defendant's systems and obtained Confidential Information belonging to Plaintiff's members. The Data Breach resulted from a known attack vector and occurred after Defendant failed to implement basic, industry-standard security safeguards. Defendant also failed to timely notify Plaintiff of the Data Breach—waiting more than two months before providing notice to affected businesses—and thereby deprived Plaintiff of the opportunity to promptly mitigate harm and protect its members.

6.    In notifications submitted to state Attorneys General, Defendant admitted that its

---

[2] https://gomarquis.com/privacy-policy.

"investigation revealed that an unauthorized third party accessed Marquis' network through its SonicWall." At the time of the incident, SonicWall firewall and SSL VPN products were affected by a publicly disclosed security vulnerability that had been actively exploited by ransomware groups for months and for which security patches and remediation guidance had been issued. Entities that failed to timely apply available patches, reset compromised credentials, or otherwise secure VPN access remained susceptible to compromise, even after initial updates were released.[3] Upon information and belief, Defendant did not take reasonable or industry-standard measures to remediate this known vulnerability, permitting attackers to gain access to its systems and resulting in the Cyber Vulnerability Incident.

7.      NOFFCU cannot fix these security problems on its own because Defendant controls the systems housing NOFFCU's members' Confidential Information. Defendant's system remains inadequately secured exposing NOFFCU's members to harms such as identity theft, account takeover fraud, and other forms of abuse.

8.      Plaintiff brings this action to recover payments made for deficient services, to obtain declaratory and equitable relief confirming NOFFCU's right to a refund of any prepaid fees and barring any improper termination or exit charges, and to recoup any and all expenses incurred as a result of the Data Breach by Plaintiff.

## II.     PARTIES

9.      Plaintiff NOFFCU is a federally chartered credit union with its principal place of business located at 4401 West Napoleon Avenue, Metairie, Louisiana 70001. NOFFCU is the second oldest federally charted credit union in the nation and serves over 28,000 members and

---

[3] https://www.bleepingcomputer.com/news/security/marquis-data-breach-impacts-over-74-us-banks-credit-unions/

more than 400 business partners across Louisiana and Mississippi.

10.     Defendant Marquis is a Texas corporation with its principal place of business located at 6509 Windcrest Drive, Suite 170, Plano, Texas 75024. Marquis provides software and related services to more than 500 banks and credit unions nationwide, including marketing, compliance, analytics, customer relationship management, digital communications, and system integrations. Marquis' registered agent for service of process is C.T. Corporation System, located at 199 Bryan Street, Suite 900, Dallas, Texas 75201, and is a citizen of the State of Texas.

### III.     JURISDICTION AND VENUE

11.     This Court has original subject-matter jurisdiction over NOFFCU's Defend Trade Secrets Act claim under 28 U.S.C. § 1331 (federal question) because it arises under the laws of the United States. Further, this Court has supplemental jurisdiction over NOFFCU's state-law claims under 28 U.S.C. § 1367(a) because these claims are so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is in this District and therefore Defendant resides in this District pursuant to 28 U.S.C. § 1391 (c)(2). Venue is further proper in this District under § 1391 (b)(2) because a substantial part of the events giving rise to Plaintiff's claims also occurred in this District.

### IV.     FACTUAL ALLEGATIONS
#### A.  The Data Breach.

13.     On or around August 14, 2025, Defendant became aware that its systems had been breached. As a result, Defendant launched an investigation which confirmed that cybercriminals

had accessed Marquis' network through its SonicWall firewall. SonicWall VPN devices have been widely targeted in recent years due to vulnerabilities and credential-based attacks that allow threat actors to obtain or reuse login credentials to gain network access, even where basic security measures are in place.[4]

14.    While the specific personal information exposed varied by individual, the compromised data included "names, addresses, telephone numbers, Social Security numbers, Taxpayer Identification Numbers, dates of birth, and financial account information lacking associated security or access codes."[5]

15.    Despite identifying the breach on August 14, 2025, Defendant did not begin providing notice to affected businesses until October 27, 2025, or begin filing notices with state attorneys general offices until November 26, 2025.  Defendant thereafter provided notice of the Data Breach to Plaintiff's members.

**B. The Relationship Between the Parties.**

16.    NOFFCU is a not-for-profit cooperative financial institution owned by individual consumers, who pool their resources to provide credit to one another. NOFFCU offers a range of financial services including savings accounts, checking accounts, loans, and online banking. NOFFCU serves more than 28,000 members and over 400 business partners across Louisiana and Mississippi and is the second oldest federally chartered credit union in the United States.

17.    Marquis is a marketing and compliance software and services provider that

---

[4] https://www.bleepingcomputer.com/news/security/marquis-data-breach-impacts-over-74-us-banks-credit-unions/.

[5] *Id.*

specializes in banks and credit unions.[6] Defendant develops and operates software systems and data platforms—including CRM, marketing, compliance, cloud, and digital-communications technologies—used by financial institutions to manage customer data and communications.

18.    Marquis provides its services to over 700 banks, credit unions, and mortgage lenders.[7]

19.    In the regular course of its business, Defendant receives and handles the following types of information from all types of clients, including credit unions such as Plaintiff:

    a.  Identifiers (for example, name, email address, postal address, phone number, and social security number);

    b.  Bank Account, Mortgage, Credit Card, Loan, and Insurance Information for Accounts…[Held] at Financial Institutions that Use Our Services (including account numbers, expiration dates, loan balances, credit limits, and related information);

    c.  Demographics / Account Application Information (i.e., birthdate and age, gender, employment, education, earnings, and other information you may have provided your financial institution when you applied for an account, loan, or insurance product);

    d.  Protected Classification Characteristics Age, Race or color, National origin, marital status, sex or Ethnicity; and

    e.  Commercial Information (for example, which products and services offered by

---

[6] https://gomarquis.com/who-we-are/about-us

[7] https://www.bleepingcomputer.com/news/security/marquis-data-breach-impacts-over-74-us-banks-credit-unions/.

your financial institution you've enrolled in, considered, or declined; information relating to real estate, vehicles, and other property you may own; information about your purchasing or consuming history or tendencies), and marketing engagement activity (including your clicks or other interactions with emails we generate.[8]

20.    In April 2024, the Parties entered into the five-year Master Services Agreement pursuant to which Marquis agreed to provide Plaintiff with marketing and data-analytics services through its OnTrax platform, including consulting, demographic analysis, email and SMS marketing, and related software tools. In connection with these services, Marquis agreed to maintain the confidentiality of Plaintiff's and its members' Confidential Information. In exchange, Plaintiff agreed to pay total annual fees of $99,930 during each year of the five-year term, consisting of software license fees, base consulting services, and marketing commitments, as set forth in Exhibit A and Schedule A to the Agreement. Concurrently with execution of the Agreement, Plaintiff paid Marquis $62,430, with the remaining portion of the annual fees to be invoiced and paid in accordance with the Agreement's pricing schedules and invoicing provisions.

21.    During their relationship, Plaintiff provided Defendants with some, or all of the information referenced in paragraph 19. Defendant stores and processes Plaintiff's members' Confidential Information across Defendant's systems.

22.    Under the Master Services Agreement, Defendant was required to follow the following standards of care:

a.    Section 6.B requires Defendant to "correct any defects or malfunctions in the

---

[8] https://gomarquis.com/privacy-policy

Software and provide Client with a corrected copy of the same without additional charge to Client as soon as reasonably practicable after Marquis's receipt of written notice of any such defects or malfunctions."

b. Section 11 of the Master Services Agreement concerns confidentiality and imposes the following obligations on Defendant:

i. "abide by the provisions of the Gramm-Leach-Bliley Act, California Consumer Privacy Act of 2018 and all laws and regulations related thereto to the extent applicable under this Agreement."

ii. "[a]ll information provided by Client to MARQUIS under this Agreement (whether related to Client, its members or otherwise) will be treated as non-public confidential Information ("Confidential Information") by MARQUIS and shall not be sold, disclosed, or otherwise conveyed to any third party by MARQUIS…"

iii. "monitor for and promptly advise the other party in writing of any unauthorized access, viewing, misappropriation, or unauthorized disclosure or use by any person of Confidential Information and take all steps reasonably requested by the other party to limit, stop, investigate, and remedy the unauthorized access, viewing, misappropriation, disclosure or use and any consequence thereof…"

iv. "maintain a current SOC 2 Type 2 (or substantially similar audit)"

23.     These obligations required Defendant to implement and maintain reasonable administrative, technical, and physical safeguards to protect the security, confidentiality, and integrity of Plaintiff's members' Confidential Information, consistent with Defendant's role as a

service provider to a federally regulated financial institution.

24.     The Master Services Agreement further reflected that Marquis bore responsibility for compliance with its confidentiality and data-protection obligations by requiring Marquis to indemnify and hold NOFFCU harmless from claims asserting that Marquis breached the Agreement or failed to comply with its contractual obligations, including obligations governing the handling and protection of Confidential Information. Read together with the Agreement's confidentiality and security provisions, these terms allocated responsibility to Marquis for safeguarding the systems and data under its control.

25.     A SOC 2 Type II audit evaluates not merely the design of controls, but whether those controls operate effectively over a sustained period of time. Defendant's obligation to maintain the current SOC 2 Type II audit therefore required Defendant to ensure that its security controls were implemented and functioning effectively on an ongoing basis. The unauthorized access to Defendant's systems, combined with Defendant's immediate post-breach implementation of basic safeguards, demonstrates that such controls were absent or ineffective at the time of the breach.

26.     In addition to and noted above, Defendant states in its own Privacy Policy that it "build[s] security into our services in order to protect your information."[9] The privacy policy further states that Defendant uses "commercially reasonable and appropriate safeguards to secure and protect the privacy, accuracy, and reliability of your information."[10]

27.     Despite these contractual obligations and the assurances set forth in Defendant's Privacy Policy, Defendant failed to implement adequate and reasonable safety measures to protect

---

[9] https://gomarquis.com/privacy-policy.
[10] *Id.*

NOFFCU's members' Confidential Information. Regardless of the specific intrusion vector, the unauthorized access to Plaintiff's members' Confidential Information demonstrates that Defendant failed to maintain security controls that operated effectively over time, as required by its SOC 2 Type II obligation.

28.     Following the Data Breach, Defendant implemented enhanced security measures that should have been implemented at the inception of the Master Services Agreement in order to avoid potential data breaches—including multi-factor authentication, firewall patching, geo-IP filtering, and endpoint detection and response tools[11]—demonstrating that these basic safeguards had not been adequately implemented or enforced prior to the Data Breach.

29.     MFA is a widely recognized, industry-standard security control for reducing the risk of unauthorized access, and regulators and cybersecurity authorities have repeatedly identified the absence of multi-factor authentication as a significant security weakness in systems handling sensitive financial and personal information.

30.     Had Defendant implemented MFA and related security measures prior to the Data Breach, the likelihood and scope of unauthorized access would have been materially reduced. Defendant's failure to do so left its systems exposed to known and foreseeable risks of unauthorized access.

31.     In August 2025, numerous ransomware incidents attributed to the Akira ransomware group were publicly reported in which the initial access vector appeared to involve SonicWall firewalls—the same type of firewall technology implicated in the Data Breach. In response, on August 4, 2025—ten days before the Data Breach—SonicWall issued guidance

---

[11] https://www.bleepingcomputer.com/news/security/marquis-data-breach-impacts-over-74-us-banks-credit-unions/ .

recommending that customers, among other steps, strengthen security by enforcing multi-factor authentication for all remote access to reduce the risk of credential abuse.[12]

32.     Upon information and belief, at the time of the Data Breach, Defendant had not implemented SonicWall's recommended guidance.

**C. Defendant Misrepresents the Adequacy of Its Security Controls in Its Privacy Policy.**

33.     Defendant's publicly available Privacy Policy contains representations regarding the security measures Defendant maintains to protect customer data.[13]

34.     In the section titled "Information Security," Defendant first states that it "build[s] security into [its] services in order to protect your information." Defendant thereafter represents that it uses "commercially reasonable and appropriate safeguards to secure and protect the privacy, accuracy, and reliability of your information and to protect it from unauthorized access, alteration, disclosure, or destruction."[14]

35.     Defendant's representations were intended to be relied upon by financial institutions—including Plaintiff—in deciding whether to enter into and continue long-term contractual relationships with Defendant.

36.     One or more of Defendant's security representations were not accurate when made. Contrary to Defendant's representations, Defendant failed to implement and maintain commercially reasonable and appropriate safeguards sufficient to protect Plaintiff's members' Confidential Information from unauthorized access by criminal third parties.

37.     Defendant made these representations without exercising reasonable care to ensure

---

[12] https://www.jdsupra.com/legalnews/ransomware-attacks-target-sonicwall-2242234/.
[13] https://gomarquis.com/privacy-policy.
[14] *Id.*

their accuracy. Given Defendant's role as a third-party service provider to regulated financial institutions and the known risks associated with credential-based and third-party attacks, Defendant knew or should have known that its security controls were inadequate to meet the standards it represented.

38.     Plaintiff reasonably relied on Defendant's security representations at contract formation and throughout the Parties' relationship when deciding to transmit its members' Confidential Information to Defendant and to continue performing under the agreement.

39.     Defendant's inaccurate and incomplete security representations harmed Plaintiff in a direct and foreseeable manner by depriving Plaintiff of material information that would have affected its assessment of risk, vendor oversight, and continued use of Defendant's services. By failing to exercise reasonable care to ensure that its security representations accurately reflected the safeguards actually in place, Defendant caused Plaintiff to continue transmitting sensitive data and paying for services it reasonably believed were secure and compliant with contractual and legal requirements.

40.     Defendant's failure to exercise reasonable care in implementing cybersecurity measures is particularly significant given its position within the financial services ecosystem. As a third-party service provider entrusted with sensitive financial data, Defendant was required to implement security controls commensurate with the heightened risks associated with servicing regulated financial institutions.

41.     As a result of Defendant's failure to exercise reasonable care to accurately disclose the scope and limitations of its cybersecurity practices, Defendant caused customers, including Plaintiff, to continue paying for its services and to delay or forgo switching to alternative providers, thereby retaining customer revenue and goodwill that it would not have retained had accurate

information been provided.

42.     Defendant's failure to implement robust cybersecurity measures is significant given its role in the financial services ecosystem. As a third-party service provider to financial institutions entrusted with sensitive data, Defendant knew or should have known that it faced heightened cybersecurity risks and was therefore required to implement security measures commensurate with those risks. Industry reporting further confirms that third-party risk has become one of the most significant cybersecurity threats facing the financial sector.[15]

43.     Consistent with these industry-wide concerns, government cybersecurity guidance recognizes that cyber threat actors increasingly target trusted third-party vendors and service providers as a means of gaining access to multiple organizations and their systems and data. By compromising a vendor rather than an individual customer, attackers can affect all users of the vendor's software or services, thereby amplifying the scope and impact of a single breach across numerous entities.

44.     Despite known and escalating cybersecurity risks, Defendant failed to timely implement reasonable security improvements or meaningfully strengthen its security controls prior to the Data Breach, even as its publicly available materials continued to describe its systems in generalized terms as secure. Defendant's failure to exercise reasonable care in aligning those statements with its actual security posture exposed Plaintiff and its members to foreseeable harm.

45.     As a direct result of Defendant's security failures, Plaintiff has incurred and will continue to incur significant expenses to safeguard members, monitor and remediate fraud, investigate suspicious activity, and address the long-term identity-theft risks created by

---

[15] https://www.helpnetsecurity.com/2025/07/11/financial-firms-third-party-cyber-risk/?utm._

Defendant's misconduct.

### D. The Impact on Plaintiff and Its Members

46.     The Confidential Information from Plaintiff's members was entrusted to Defendant.  Once compromised, this Confidential Information can be exploited to cause a wide range of financial harms, including unauthorized account access, fraudulent transactions, circumvention of fraud controls, and impersonation of members across multiple systems.

47.     The harm does not cease with the initial incident. Once exposed, members' information may circulate indefinitely—including on illicit marketplaces—creating continuing risks of identity theft, account takeover, and downstream fraud long after the original exposure. The stolen data may also be used to cause non-monetary harms, including harassment, extortion attempts, and targeted stalking.

48.     In addition to the impact to Plaintiff's members', industry research further confirms that breaches involving third-party vendors impose substantial financial burdens on affected organizations. The *IBM Cost of a Data Breach Report 2025* identifies "third-party vendor and supply chain compromise" as the second most prevalent attack vector and one of the costliest, with an average breach cost of approximately $4.91 million—second only to malicious insider attacks.[16]

49.     Beyond these financial harms, third-party breaches also commonly result in significant operational disruption. Industry reporting explains that third-party service providers often underpin critical aspects of organizations' operations, and that breaches affecting such providers can cause substantial downtime and business interruption for their customers, even where the breach originates in the vendor's environment rather than the affected organization's

---

[16] https://www.bakerdonelson.com/webfiles/Publications/20250822_Cost-of-a-Data-Breach-Report-2025.pdf.

own systems.[17]

## CLAIMS FOR RELIEF

### <u>COUNT I</u>
**Breach of Contract**

50.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49, as though fully set forth herein.

51.     NOFFCU and Marquis entered into the Master Services Agreement for a five-year term. Under the Master Services Agreement Marquis licensed its marketing analytics software and provided ongoing marketing consulting and campaign services to NOFFCU.  In connection with these services, Marquis agreed to maintain the confidentiality of Plaintiff's and its members' Confidential Information.

52.     Marquis breached the Master Services Agreement in the following ways:

a. failing to treat information provided by Plaintiff—whether related to Plaintiff, its members, or otherwise—as non-public confidential "Confidential Information," and failing to prevent unauthorized access to and disclosure of that Confidential Information as required by Section 11;

b. failing to adequately monitor for and promptly advise Plaintiff in writing of unauthorized access, viewing, misappropriation, disclosure, or use of Confidential Information, and failed to take the steps reasonably requested to limit, stop, investigate, and remedy the unauthorized activity and its consequences as required by Section 11; and

---

[17] https://www.verizon.com/business/resources/T9c1/reports/2025-dbir-data-breach-investigations-report.pdf.

  c. failing to maintain security controls operating effectively over time consistent with a current SOC 2 Type II (or substantially similar) audit, as required by Section 11, as evidenced by the unauthorized access to Plaintiff's members' Confidential Information and Marquis's post-breach implementation of enhanced security measures.

53. NOFFCU has fully performed each of its obligations under the Master Services Agreement.

54. NOFCCU is ready, willing, and able to perform its remaining obligations until the contract is terminated or is rescinded by an order of this Court.

55. Marquis breaches proximately caused damage to NOFFCU by depriving it of the full bargained-for value of the breached provisions of the Master Services Agreement.

56. Marquis's breaches constituted a material and unjustified failure to perform essential terms of the Master Services Agreement, including its obligations to safeguard Confidential Information, maintain effective security controls, and promptly detect and report unauthorized access—obligations that were fundamental to the Parties' agreement and to NOFFCU's ability to lawfully engage Marquis as a service provider.

57. Because Marquis' nonperformance defeated the essential purpose of the Master Services Agreement, monetary damages alone are not adequate to restore NOFFCU to its pre-contract position or to fully remedy the consequences of Marquis's material breaches.

58. Under these circumstances, equitable rescission is appropriate to unwind the parties' relationship, restore NOFFCU to the status quo ante, and prevent Marquis from retaining the benefits of a contract whose essential terms it failed to perform.

59. As a consequence of rescission, NOFFCU is entitled to restitution restoring it to the

status quo ante, including recovery of all amounts paid to Marquis under the Master Services Agreement for services that were materially deficient, nonconforming, or rendered valueless by Marquis's breaches.

## COUNT II
### Negligent Misrepresentation

60.     Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49, as though fully set forth herein.

61.     In the course of marketing and providing data-driven software, analytics, and consulting services to federally regulated financial institutions, including NOFFCU, Marquis supplied information for the guidance of its customers in connection with business transactions, decisions concerning the selection and continued use of Marquis as a service provider, the sharing of member data through Marquis' systems, and the security and confidentiality measures applicable to that data.

62.     In that context, Marquis had a pecuniary duty to exercise reasonable care in providing accurate information concerning the security and safeguarding of Confidential Information which includes financial and personal data entrusted to its systems.

63.     Specifically, in its publicly available Privacy Policy and related marketing materials, including materials provided to NOFFCU before and during the parties' contractual relationship, Marquis represented that it:

      a.  "build[s] security into [its] services in order to protect your information"; and

      b.  uses "commercially reasonable and appropriate safeguards to secure and protect the privacy, accuracy, and reliability of your information and to protect it from unauthorized access, alteration, disclosure, or destruction."

64.     Marquis supplied this information with the expectation and intent that financial

institutions such as NOFFCU would rely on it in deciding whether to entrust Marquis with sensitive member data and to enter into and continue contractual relationships with Marquis.

65. At the time these representations were made, Marquis failed to exercise reasonable care in obtaining and communicating the information. Contrary to the representations, Marquis had not implemented or maintained commercially reasonable and appropriate security safeguards sufficient to protect confidential financial and personal information from unauthorized access.

66. As alleged herein, Marquis' systems lacked adequate industry-standard security controls, including multi-factor authentication, and were vulnerable to known and foreseeable attacks, rendering Marquis' security representations false or misleading when made.

67. NOFFCU reasonably relied on Marquis' security representations in deciding to enter into the Master Services Agreement, to transmit its members' Confidential Information to Marquis, and to continue paying fees and performing under the Agreement.

68. Marquis is in the business of supplying information—including analytics, compliance-related insights, and data-management guidance—to financial institutions for use in their business operations, including guidance that informed how customer data would be handled, stored, and safeguarded within Marquis' systems, and its security representations were a core component of that informational guidance and not merely incidental to the sale of a product or service.

69. As a direct and proximate result of Marquis' negligent misrepresentations, NOFFCU suffered pecuniary loss, including:

      a. Fees paid for services represented as secure and compliant but that were not;

      b. Any costs incurred to investigate, mitigate, and remediate the effects of the Data Breach; and

c.    Increased compliance, oversight, and vendor-management costs resulting from reliance on inaccurate security information.

70.    Marquis breached its duty to exercise reasonable care in supplying accurate information, and NOFFCU suffered damages caused by its justifiable reliance on that information.

71.    NOFFCU has been damaged in an amount to be proven at trial, together with pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT III
### Unjust Enrichment

72.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49, as though fully set forth herein.

73.    This claim is pleaded solely in the alternative to Plaintiff's breach of contract claim, and only to the extent the Court determines that the Master Services Agreement has been rescinded, is unenforceable, or otherwise does not govern the parties' rights with respect to the fees paid by Plaintiff.

74.    Marquis received and retained payments from Plaintiff for services rendered in connection with the handling, storage, and processing of Plaintiff's members' Confidential Information.

75.    In the event the Master Services Agreement is rescinded or otherwise determined not to provide an adequate remedy at law, Marquis's retention of those payments constitutes an enrichment at Plaintiff's expense.

76.    Plaintiff was correspondingly impoverished by making payments for services that, under such circumstances, failed their essential purpose and did not provide the fundamental benefit for which Plaintiff bargained.

77. The enrichment and impoverishment are directly related, and in the absence of a governing contract or adequate legal remedy, Marquis lacks justification for retaining the payments received.

78. Equity and good conscience therefore require that Marquis disgorge and make restitution of the amounts paid by Plaintiff, together with interest, to restore the parties to the status quo ante.

**COUNT IV**
**Defend Trade Secrets Act of 2016 (18 U.S.C. § 1836, *et seq.*)**

1. Plaintiff re-alleges and incorporates by reference each and every allegation contained in paragraphs 1 through 49, as though fully set forth herein.

2. NOFFCU is the owner of all right, title, and interest in and to certain valuable trade secrets relating to its business operations. NOFFCU's trade secrets include, but are not limited to, the identities and contact information of its members and employees, the compilation of members' financial history and transactions as reflected on account records and information, and credit information.

3. NOFFCU's trade secrets are related to products and services used in and intended to be used in interstate and foreign commerce.

4. Other than through unlawful acquisition, the trade secrets are not known to the public and are not readily ascertainable by proper means to persons who could derive value from their disclosure or use.

5. NOFFCU has taken reasonable measures to maintain the secrecy of its trade secrets, including insisting that Marquis protect their secrecy pursuant to the Master Services Agreement and Privacy Policy.

6.      NOFFCU has invested substantial resources in developing and protecting its trade secrets. NOFFCU's trade secrets provide it with economic advantages over its competitors.

7.      Marquis knew or should have known that NOFFCU's information at issue comprised NOFFCU's trade secrets.

8.      Marquis misappropriated and continued to misappropriate NOFFCU's trade secrets by disclosing them without authority and acquiring and continuing to acquire them through improper means, including by misrepresenting to NOFFCU the existence and nature of Marquis's security controls. Had Marquis provided truthful information to NOFFCU, it would not have furnished its trade secrets to Marquis and allowed, and continued to allow, those trade secrets to be stored and accessible on Marquis's insecure systems.

9.      At the time of Marquis' use and disclosure of NOFFCU's trade secrets, Marquis knew or had reason to know that it acquired the trade secrets by improper means, under circumstances giving rise to a duty to maintain their secrecy or limit their use, from or through a person who had a duty to NOFFCU to maintain the trade secrets' secrecy and limit their use, or by mistake prior to a material change of Marquis's position.

10.     Marquis' misappropriation of NOFFCU's trade secrets was done for its own commercial advantage, allowing Marquis to obtain and retain excessive payments from NOFFCU.

11.     Marquis' acts constitute violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*

12.     Marquis' misappropriation was willful and malicious, entitling NOFFCU to exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

13.    As a direct and proximate result of Marquis' misappropriation of NOFFCU's trade secrets, NOFFCU has suffered and will continue to suffer damages and harm.

### JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

### Prayer for Relief

WHEREFORE, NOFFCU respectfully requests that the court grant the following relief:

a. **Damages for breach of contract**, including compensatory and consequential damages, in an amount to be proven at trial, for Marquis' failure to perform its contractual obligations under the Master Services Agreement;

b. **Equitable rescission of the Master Services Agreement**, unwinding the Parties' relationship based on Marquis' unjustified failure to perform essential terms of the Agreement;

c. **Restitution and disgorgement**, restoring NOFFCU to the status quo ante, including recovery of all amounts paid to Marquis under the Master Services Agreement for services that were materially deficient, nonconforming, or rendered valueless by Marquis' breaches;

d. **Damages for negligent misrepresentation**, including pecuniary losses proximately caused by NOFFCU's reasonable reliance on Marquis' inaccurate and incomplete security representations, including fees paid and costs incurred to investigate, mitigate, and remediate the Data Breach;

e. **Damages for trade secret misappropriation**, including exemplary damages under 18 U.S.C. § 1836(b)(3)(C) and reasonable attorneys' fees under 18 U.S.C. § 1836(b)(3)(D);

f.  **Declaratory relief** declaring the Parties' respective rights and obligations under the Master Services Agreement, including NOFFCU's right to rescind the Agreement, recover prepaid fees, and terminate the relationship without penalty or improper exit charges;

g.  **Indemnification** of NOFFCU's losses;

h.  **Costs of litigation**, awarding NOFFCU its attorneys' fees and costs, and the maximum prejudgment and post judgment interest allowed by law; and

i.  Award any further relief as the Court deems just and proper.

Dated: January 13, 2026

/s/ David L. Hecht_____
David L. Hecht
HECHT PARTNERS LLP
125 Park Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 851-6821
dhecht@hechtpartners.com

Charles J. Nerko  (*pro hac vice* forthcoming)
NERKO PLLC
1178 Broadway, 3rd Floor
New York, NY 10001
Telephone: (518) 363-9100
cnerko@nerko.com